THE FIRE ASSOCIATION OF PHILADELPHIA v. THE MER-
CHANTS' NATIONAL BANK OF ST. JOHNSBURY.

*Evidence. Cross-Examination. Presumption of Innocence.*

In an action of assumpsit to recover the amount of a draft drawn on the plaintiff, dis-
counted by the defendant, sent forward for collection and paid by the plaintiff,
the question being whether one H. had forged the name of G., the payee, as an
endorsement on the draft, and misappropriated the proceeds, *Held,*

1. The objection being general, evidence to prove that H., when the draft was drawn,
was pressed for money, that one party having indorsed for him for several hun-
dred dollars, was pressing him at that time for payment; also, his liabilities
and the character of the claims, as that he had misappropriated funds, was ad-
missible to prove his motive for forgery, and to meet defendant's testimony as
to his liabilities.

2. Evidence as to conversation between H. and G., and postal cards written by G. to
H. making inquiries as to the draft, subsequent to making the draft, were ad-
missible.

3. It was legitimate cross-examination to inquire of H. as to his financial standing and
that of the firm to which he belonged, at the time when the draft was drawn.

4. The court properly disregarded the defendant's request, that it was not to be af-
fected in any manner by the acts, conduct, etc., of H. and G. after it purchased
the draft.

5. It is presumed that H. was innocent, and it was incumbent on the plaintiff to over-
come that presumption; but it was proper for the jury to consider the fact that
he had been convicted of the forgery in question in a criminal prosecution, as
proper evidence to overcome the presumption.

6. Presumption of innocence, explained.

ASSUMPSIT. Trial by jury, June Term, 1881, Caledonia
County, Ross, J., presiding. Verdict for the plaintiff. Plea,
general issue.

The plaintiff claimed to recover of the defendant the sum of
$541.10, paid by the plaintiff upon a draft drawn by Bowman &
Hopkins upon the plaintiff in favor of Charles H. Green, which
draft the defendant had discounted, and sent forward for collec-
tion of the plaintiff, bearing upon it what purported to be the in-
dorsement of Green, the payee, but which indorsement the plain-
tiff claimed was not the signature of Green, nor authorized by
him, but forged.

The following facts were conceded: Green, who was a furni-
ture dealer in Barton, had an insurance on his stock in plaintiffs'

42

company, which was effected by Bowman & Hopkins, insurance agents at St. Johnsbury. Green had also an insurance on the same stock in the Phœnix Company of Hartford, Conn.

About the 18th of July, 1876, Green's stock was partially destroyed by fire. The amount of the loss was settled by an adjuster and the proportion of the loss for the plaintiff to pay was the sum of $511.41. The proper proof was made to the plaintiff of Green's loss, and plaintiff wrote to Bowman & Hopkins to draw on them for the amount.

On Tuesday morning, August 1, 1876, Green sent a card to Hopkins that he was going to Wells River, but should be up on the three o'clock P. M. train, and desired Hopkins to meet him at St. Johnsbury depot and settle his loss. Hopkins met Green at the depot as requested, where they had an interview. The train stopped but seven minutes at St. Johnsbury; and Green went north on the train. Soon after the train left, Hopkins went to the defendant bank with the draft in question, with the name of Chas. H. Green written upon it, and on producing the plaintiff's letter authorizing Bowman & Hopkins to draw in favor of Green, the draft was discounted by the defendant and the amount paid to Hopkins. The defendant sent the draft forward for collection in due course, and the plaintiff paid it on presentation about the 4th of August, 1876.

Immediately after procuring the draft to be discounted at the Merchants' Bank, Hopkins went to the First National Bank, where he deposited $420 of the money thus obtained at the Merchants' Bank, in his own name, and at the same time procured a draft for the sum of $411, in favor of one Emerson, and the same was delivered to Emerson the same day. The balance of the money was not deposited and no account of the transaction was entered on the books of Bowman & Hopkins.

The plaintiff introduced said Green as a witness, who testified as follows in relation to the interview between him and Hopkins at the St. Johnsbury depot : " I met Hopkins near the lower end of the platform of the depot. I told him I wanted to settle up my insurance. He said that was what he came for. Hopkins said he had forgotten the amount, and asked me to give it to him. I told him it was $511.41. He took out a piece of paper from his pocket-book and asked me to put down the amount. I did in figures. He said, write your name so I may know what it is when I get to the office. I took a pencil from my pocket and stepped to the corner board, and he said, write your name in full, Charles H. Green, and I did so. He said he would send it to the company, and the company would send a draft to him, and he would

send it to me, and I should get it by Saturday or Monday. I told him I wanted it." The said Green denied that on that occasion he went into the baggage room of the depot or that he wrote anything with a pen, or wrote anything except on the corner board as above stated, and denied that he wrote his name or authorized any one to write his name on the controverted draft. The name on the back of the draft was written *Chas. H. Green.* The defendant introduced the said E. D. Hopkins as a witness, and in relation to the interview between him and Green at the depot, and what transpired on the occasion, testified as follows : " I got word from him to meet him at the depot on the up express train. Near time of express I went down to depot to settle with him. Met him down by lower end of platform. Can't tell which first alluded to business ; think he said he came to see about his insurance, and I told him that was my purpose. I asked him the amount. He told me. I asked if it was less the discount ; can only judge ; think it was amount I wrote in inside the draft, $541.11. Couldn't determine that ; told him I would fix it, make a draft, and he could sign it, and I would send it on. We went into baggage room and I filled out draft and told him to write his name on it same as it was written inside, and he did so. He wrote it at desk in baggage room at depot, and I saw it. Don't recollect I had any special conversation except he asked me to hurry it up."

The testimony of these two witnesses was mainly the only direct evidence on the question of the making of said draft and endorsement and by whom the endorsement was made.

The plaintiff introduced a letter written by Hopkins in the fall of 1876, wherein Hopkins stated that August 1 he and Green went into the baggage room, and Roach, the baggage master, handed him a pen to write the draft ; and also Roach testified that he knew Green well, but never saw him in the baggage room alone or with Hopkins until after August 1, 1876, and that he did not hand Hopkins a pen there in the presence of Green.

The plaintiff introduced evidence tending to support and corroborate its witness, Green.

The defendant introduced evidence tending to support and corroborate its witness, Hopkins.

The plaintiff introduced witnesses acquainted with Green's handwriting, and also witnesses claiming to be experts in handwriting, whose testimony tended to prove that said indorsement on said draft was not the handwriting of Green.

The defendant introduced witnesses of the same character,

whose testimony tended to prove that said endorsement was the true and genuine signature of Green.

The case, however, largely depended on the degree of credit to be given to the main and direct witnesses, Green and Hopkins.

In the examination-in-chief of Hopkins, not in answer to any direct inquiry, the witness said he went away September 26, and that Bowman & Hopkins were not then in a failing condition as he knew of; that there was no need of their failing.  He was subsequently inquired of, in chief, as to his own and the firm's assets and liabilities August 1, 1876, and for a few days following.  When the cross-examination was reached, the plaintiff's counsel asked witness to furnish a list of his company's assets on that and following days, and remarked that his claim that Bowman & Hopkins were solvent at that time was new to them.  No disclaimer of the witness' voluntary statement was then, nor at any time, made.

The plaintiff also offered in rebuttal to prove by Edwin Joslin of Barton, that he came down to St. Johnsbury on the morning train of August 1, 1876, and returned to Barton on the same train in the afternoon with Green ; that at St. Johnsbury he had an interview with Hopkins in regard to matters between his firm and Hopkins ; that his firm was indorser on a note for Hopkins at the First National Bank of $550, and that a check for $200 his firm had sent to Hopkins had been used by him contrary to their direction ; that he told Hopkins that he had come down with a determination to have that paper taken up that day or put in a way of being fixed up ; that Hopkins said he could not do anything that day ; that Hopkins said he had got to go to the depot to meet a man, and he went to the depot with him and immediately took his seat in the train for home, before the interview between Hopkins and Green ; that after leaving St. Johnsbury he had conversation with Green in the cars about his insurance.

All this evidence of Joslin was seasonably objected to by the defendant, but admitted by the court, to which defendant excepted.

The plaintiff also offered in evidence, in support of its case, certain correspondence and interviews between Green and Hopkins in the months of August and September, 1876, after the draft had been negotiated by Hopkins to defendant.  Three postal cards were introduced and read, written by Green to Bowman & Hopkins.  Green testified that he received no replies to the first and second cards ; and the reply to the third card was written by Bowman, Hopkins having gone away to New Hampshire.

Hopkins denied having seen but one of these cards, either the first or second, and there was no evidence he saw them except that they were found in the files of Bowman & Hopkins ; and Bowman testified that Hopkins had a separate table, and that he laid these and all other mail matter addressed to him, which came in his absence, upon Hopkins' table.

Plaintiff also gave evidence of three interviews between Green and Hopkins, two at Barton and one at St. Johnsbury ; that at these interviews Green asked Hopkins if that check had come from the company, and Hopkins replied it had not, and he had not heard a word from it, and probably the company were going to take their sixty days.

The evidence in relation to this correspondence between Hopkins and Green, and all acts or declarations of either, after the discount of said draft by the defendant, was seasonably objected to by defendant, but admitted by the court for the purpose of showing the acts and understanding of the parties to the transaction before any controversy had arisen ; to which the defendant excepted.

Hopkins testified that when the draft was drawn he was uncertain whether it was drawn for the exact amount, and whether the discount of interest for sixty days to which the company was entitled had been taken out ; and that he told Green as soon as he heard from the company he would send him the money or a check for the amount ; and that he wrote the company the night after the draft was drawn that he was uncertain as to the amount, and requested an answer as to that. Hopkins' letter was read in evidence. Hopkins admitted the interviews as stated by Green, but that Green's inquiry was, whether he had heard from the company, and that he replied he had not.

On the cross-examination of Hopkins, counsel for the plaintiff proposed to examine him as to the financial standing of Bowman & Hopkins, and also his own financial condition, claiming that both were hopelessly insolvent on the 1st of August, 1876. To this defendant objected, but the court admitted the same.

Green testified that not getting his money as he expected, about the last of September, 1876, he procured one Parker to write to plaintiff on the subject, and received a reply that they had paid the amount on a draft indorsed by him ; that he wrote them that his indorsement was not made by him or by his authority ; that thereupon the plaintiff sent Pope, its agent, to investigate the

matter ; that Pope came to see him, and he claimed to Pope that his name on the draft was a forgery. How much investigation Pope made did not appear, as Pope is now dead ; but on the return of Pope the plaintiff paid the amount of the loss to Green, and brought this suit to recover the money paid on the draft.

The plaintiff introduced several witnesses in relation to the character of Hopkins, most of whom testified that, by common report, his did not stand upon a par with men in general. On cross-examination, some of them stated they heard nothing against his character before the failure of Bowman & Hopkins in the fall of 1876.

The defendant also claimed, and requested the court to charge the jury, that this defendant was not to be affected in any manner by the acts, conduct, declarations, or admissions of Hopkins and Green, or either of them, made or done after the defendant had purchased the draft in question, and of which the defendant had no knowledge.

So far as the court charged at all upon the subject of this request, it was as follows :

" The direct testimony is that of Green and Hopkins. Bearing upon that somewhat is the testimony of Drew and the testimony of Joslin, and bearing upon it more or less directly, is the conduct of the parties on that day and afterward—that is, the conduct of the actors, Green and Hopkins—not of these parties. These papers were all put in, the communications, the postal cards, &c., and various papers were put in as bearing on the conduct, not as to the truth of their contents particularly, but as to the conduct of these parties relative to this transaction, to enable you to determine which one is telling the truth about it. The plaintiff relies upon Green's testimony, upon Joslin's testimony, upon Drew's testimony, and upon these postal cards, upon the testimony of Chandler, Austin and Foster, as tending to show that Green understood all along, till the facts came out, this matter different from what Hopkins says the transaction was. They rely also upon the conduct of Hopkins, that he was in straightened circumstances. They say that the testimony tends to show that ; that he was under the necessity of having some money ; that he had gone to Stevens to get this computed before hand ; that he knew all about what the sum was ; that it is pretence that he didn't know what the sum was ; that he went to the Merchants' Bank to get this cashed rather than to the First National Bank ; that he took

this and paid it to Emerson rather than to Green, and that he knew that Green wanted the money, and then in their subsequent conversations he didn't enlighten Green that he had the money, and in all the conversations talked as though he had not drawn the money at all, and that the money was still coming from the Fire Association, and that he had not the funds. I only hint briefly at this testimony and what they claim.

On the other hand the defendant relies on the testimony of Hopkins ; also, upon the ink. They say it must have been done there in the baggage room, and it is improbable that he would attempt to forge there, his unfamiliarity with Green's handwriting and inability to imitate it so closely, and the close imitation—if it is an imitation—of the signature, and the form of the signature ' Chas.' instead of ' C. H.' or ' Charles H.' You have heard the various claims put forth by the defendant in regard to it."

The defendant also insisted, and requested the court to charge the jury, that inasmuch as the issue made by the plaintiff in the case involved the necessity of establishing the fact that Hopkins had committed the crime of forgery in writing Green's name upon the back of the draft in question, the presumption of law was against it, and that to establish its right to recover, the plaintiff must overcome not only the evidence of the defendant, but also this legal presumption of innocence as well, by a fair balance of evidence in the plaintiff's favor.

Upon this subject the court charged the jury as follows :

" There is in this class of cases another principle also that applies. In all civil cases where the establishment of the issue on trial involves a crime, you are entitled to take into consideration that fact in determining whether the issue is made out or not ; and the rule is very much as stated by Judge POLAND, that the legal presumption of innocence attaches, and is to be weighed in favor of the party who claims that the transaction is an innocent one. But that is a legal presumption of innocence, and is nothing more than this, that the jury are not to start out with the idea that the crime has been committed, and that it is a crime ; but from all that is developed in the case they will say whether from the character that is developed of the person who is claimed to have committed the crime, just what there is to that legal presumption and how much weight they will give it. A man has always borne a good character, if there is nothing about the case itself that shows anything that would contaminate his character, then there is something to this legal presumption of innocence.

Every man is presumed to be innocent until he is proved guilty. Against some men it would take stronger proof (it depends upon the man's character) to overcome that legal presumption than it would as to others. The legal presumption is to have just such weight as the jury think it ought to have in the given case, from what they learn about the party that is accused of the criminal transaction, his motives and his character. This is what I understand is meant by the legal presumption of innocence.

The law presumes that a man will not commit a crime ; ordinarily men do not do it. Some men have so high a standard of right and wrong, and their character is shown to be such, that this legal presumption of innocence in regard to that particular man is entitled to great weight. Other men are shown during the trial to be of such a character that very much less motive and inducement would overcome this legal presumption ; and it is for the jury to say, from all they learn in regard to the party that is claimed to have done the criminal act in a civil case, just what weight they will give to this legal presumption in determining the issue ; and it is for you to say in this case, whether you think that is overcome ; whether the plaintiff has established by a fair balance of testimony—weighing that legal presumption, giving it such weight as you think it ought to have in this case—whether the plaintiff has fairly established by a fair balance of the testimony, so that your minds more think it is so rather than otherwise, that that signature upon that draft is not the genuine signature of Charles H. Green."

*Walter P. Smith*, for the defendant.

The plaintiff was bound by the answers of Hopkins on his cross-examination, as to what took place between him and Joslyn. It was a collateral matter. *Stevens* v. *Beach*, 12 Vt. 585 ; *Sterling* v. *Sterling*, 41 Vt. 80 ; *Wing* v. *Hall*, 47 Vt. 182 ; *State* v. *Hoffman*, 46 Vt. 176 ; *People* v. *Moore*, 15 Wend. 421 ; *Lawrence* v. *Barker*, 5 Wend. 301 ; *Jackson* v. *Son*, 2 Cal. 178 ; *Howard* v. *City Fire Ins. Co.*, 4 Den. 502 ; *Fairchild* v. *Bascomb*, 35 Vt. 398 ; *Purchase* v. *Mattison*, 6 Duer, 587.·

The testimony of Joslyn and Green, and the postal cards were not admissible. 1 Greenl. Ev. s. 180, 190 ; *Drown* v. *Strafford*, 47 Vt. 579 ; *Banfield* v. *Parker*, 36 N. H. 358 ; *Bartlett* v. *Delprat*, 4 Mass. 702 ; *Taylor* v. *Webb*, 54 Miss. 36 ; *Clark* v. *Wait*, 12 Mass. 439 ; *Burbank* v. *Willey*, 79 N. C. 501 ; *Packer* v.

*Gonsalus*, 1 Serg. and R. 526 ; *Warden* v. *Powers*, 37 Vt. 619 ; *Mahurin* v. *Bellows*, 14 N. H. 212 ; *Hoyt* v. *Hoyt*, 37 N. J. Eq. 399 ; *Holbrook* v. *Holbrook*, 113 Mass. 74 ; *Snow* v. *Warner*, 10 Met. 132 ; *Campbell* v. *Coon*, 51 Ind. 76.

It was error to admit evidence of the general solvency or insolvency of Hopkins and Bowman & Hopkins, Aug. 1, 1876. *Dole* v. *Erskine*, 37 N. H. 327 ; *Melvin* v. *Bullard*, 35 Vt. 268 ; *Keith* v. *Taylor*, 3 Vt. 153 ; *Phelps* v. *Conant*, 30 Vt. 277 ; *Rowe* v. *Bird*, 48 Vt. 578 ; *Eastman* v. *Moulton*, 3 N. H. 156 ; *Bishop* v. *Wheeler*, 46 N. H. 409.

There was error in the charge of the court as to the presumption of innocence. *Bradish* v. *Bliss*, 35 Vt. 328 ; Bishop Crim. Pro. s. 488 ; 1 Am. Crim. Law, s. 824 ; *Danner* v. *State*, 54 Ala. 127 ; *State* v. *Hopkins*, 50 Vt. 332 ; 12 Vt. 604 ; 56 N. Y. 363.

*Belden & Ide*, for the plaintiff.

Joslyn's testimony was admissible to show a motive on the part of Hopkins to perpetrate the forgery. This evidence showed by direct admission from him that, on the very day in question, before the offence was committed, he was pressed for money, needed it, and did not have it. *Flanagan* v. *State*, 46 Ala. 703 ; *McKenzie* v. *State*, 26 Ark. 334 ; *Hunter* v. *State*, 43 Ga. 483 ; *Williams* v. *People*, 54, Ill. 422 ; *Shelton* v. *State*, 34 Tex. 662 ; 40 Vt. 285, 624 ; 21 Pick. 518 ; Rosc. Crim. Ev. 289.

The law is that if evidence is admissible on general grounds, it cannot be resisted on the ground that it discloses other offences. Rosc. Crim. Ev. 90.

A party is not entitled, under a general objection to a conversation, which is itself admissible, afterwards to pick out some one fact to which no attention was directed at the time, and insist that there was error in admitting that although everything else covered by the objection was admissible. 2 Cush. 31 ; 6 Allen, 109 ; 116 Mass. 251 ; 22 Mich. 117 ; 49 Cal. 552 ; 69 Ill. 492 ; 75 Ill. 381 ; 55 Ala. 468 ; *Buckley* v. *Buckley*, 12 Nev. 423 ; *Gharkey* v. *Holsted*, 1 Smith, 208 ; *Hamilton* v. *Smith*, 1 Smith, 336 ; *Carter* v. *Hanna*, 2 Carter (Ind.) 45 ; *Matthews* v. *Lecompt*, 24 Miss.; *Rosenhim* v. *Ins. Co.* 33 Miss. 230 ; *Mumford* v. *Thomas*,

10 Ind. 167 ; *Dewey* v. *University*, 16 Ind. 220 ; *Leet* v. *Wilson*, 24 Cal. 398.

The plaintiff had a right to cross-examine Hopkins as to his own and his firm's financial condition on August 1 ; because the matter was material to the issue on the question of motive.    40 Vt. 285, 624; 1 Phil. Ev. 734; 26 Vt. 270 ; 41 Vt. 690 ; 51 Vt. 222 ; 22 Pick. 394 ; 113 Mass. 452 ; 114 Mass. 307 ; 119 Mass. 91.    No error in the charge of the court.    23 Vt. 120 ; 38 Vt. 107 ; 47 Vt. 1.    Presumption of innocence.    *Bradish* v. *Bliss*, 35 Vt. 328.

The opinion of the court was delivered by

TAFT, J.    I.    The plaintiff claimed that Hopkins, on the first day of August, 1876, forged the name of Charles H. Green as an endorsement on a draft drawn on the plaintiff that day by Hopkins, had the draft discounted by the defendant, and misappropriated the proceeds.    Hopkins, as a witness for the defendant, was inquired of on his examination in chief as to his assets and liabilities, and as to those of the firm of Bowman & Hopkins on that day and a few days following.    One Joslyn was called by the plaintiff as a witness, and his testimony tended to show that on the same day he, Joslyn, was pressing Hopkins for the payment, or fixing up of claims amounting to several hundred dollars, for which Joslyn was liable.    The defendant excepted to the admission of the evidence of Joslyn ; and the question is, was its admission error ?    No specific objection was made.    We think its admission proper for the purpose of showing that Hopkins was pressed for money on that day, and the character of the claims made against him ; that one of them was a claim for the misappropriation of funds.    The stronger the pressure upon him for money, which he did not have, the stronger the motive to commit the forgery and thus obtain it.    If he did commit the forgery, it was to obtain money ; and the testimony of Joslyn tends to show, that he was in want of it.    The defendant had introduced evidence as to Hopkins' liabilities ; the plaintiff should certainly be permitted to meet it ; and the testimony of Joslyn tended to show a large indebtedness.    The amount of such liabilities was a mate-

rial question ; and we think the evidence legitimate upon that subject.

II.   Green testified that Hopkins agreed with him, at the interview had on the first day of August, 1876, that he, Hopkins, would send to the plaintiff for a draft for the amount of the witness' claim, and when it came he would send it to him.   Evidence was offered tending to show that subsequently Green · asked Hopkins if the draft had come, and the court admitted it, with the reply that Hopkins made ; and also admitted in evidence postal cards written by Green to Hopkins, each making the same inquiry.   These cards were written after the draft had been negotiated.   The evidence tended to show that Hopkins did not reply to either card, and he claimed that he did not receive them.   The defendant excepted to the evidence of the conversations and correspondence between Hopkins and Green detailed above.   The important question at issue was, whose story was entitled to credit, Green's or Hopkins'.   The facts as found by the jury as to the conversation and cards would have great weight in giving character to the transaction between them on the first day of August, as showing how the parties understood it ; whether Hopkins did agree to send to the plaintiff for a draft and then drew one and forged Green's endorsement, as the plaintiff claimed, or whether the draft was executed and endorsed by Green, as Hopkins testified it was.   In our opinion the evidence was proper for the purpose for which it was admitted ; showing how the parties understood the transaction and affecting the credibility of their testimony. What the transaction was, was a legitimate inquiry, both Green and Hopkins had testified in relation to it, and the evidence as to the subsequent conduct and acts of the parties inconsistent with their testimony affected their credibility.   The defendant's counsel admit that it was proper to impeach Hopkins, but insist that the evidence was not admitted for that purpose.   We think it was.   It was admitted for the purpose of showing what the parties' acts were in relation to the transaction, how they understood it, and if the jury believed that Hopkins' conduct and admissions were inconsistent with his testimony, it did tend to virtually impeach

him. A fair construction of the exceptions is, that it was admitted for that purpose : the court told the jury that it was to enable them " to determine which one was telling the truth about it."

III. The defendant's counsel inquired of Hopkins as to his own and Bowman & Hopkins' assets and liabilities on the first day of August, 1876. We think it was legitimate cross-examination for the plaintiff's counsel to inquire as to his and the firm's financial standing. It was not a collateral fact, but relevant to the question of Hopkins' bankruptcy and want of money, which constituted a motive for the commission of the forgery, and was proper to be shown in chief and certainly to be inquired about on cross-examination, after the witness had testified as to his assets and liabilities and those of the firm.

IV. The defendant was not entitled to a compliance with its request, that it was not to be affected in any manner by the acts, conduct, declarations, or admissions of either Hopkins or Green, made or done after the defendant had purchased the draft in question, and of which the defendant had no knowledge. We have already decided that the acts and declarations of Hopkins are admissible for the purpose stated. The defendant would therefore be affected by them to that extent. Not being entitled to the charge as requested, it was not error for the court to refuse it. *Bates* v. *Cilley*, 47 Vt. 1.

V. The remaining question is in regard to the request to charge, as to the presumption of Hopkins' innocence. The request is in accordance with the rule laid down in *Bradish* v. *Bliss*, 35 Vt. 326, that in civil cases, whenever the act alleged involves fraud, or crime, the legal presumption of innocence must be overcome by the party who asserts the contrary. The defendant was entitled to the charge called for by the request. Was it given ? Detached sentences from the instructions may be selected indicating that it was not ; but we think the question was, as a whole, fairly and fully explained and the request properly complied with. The general rule was correctly stated, and the jury were told to

find from all that they learned in regard to Hopkins just what weight they would give to this legal presumption in determining the issue then on trial, and whether the presumption of innocence was overcome ; whether the plaintiff had established by a fair balance of testimony, giving the presumption such weight as it ought to have, that the signature of Green was a forgery. They were told to determine the matter " from all that they learned in regard to the party that is claimed to have done the criminal act." The counsel argue that this gave them liberty to use facts that were not properly in the case, innuendoes of counsel, and knowledge coming to them incidentally, that they were not told *how* they must learn it, nor *when*. No request was made to have the jury instructed in this respect ; and we do not think the court ought to presume that the jury felt authorized to, and did, try the case from their own knowledge of the facts involved in it ; or that they understood from the language of the court that they were at liberty to act upon evidence that had not been given in court. If from evidence which was properly in the case the jury learned that Hopkins was guilty of other offences ; or that in a criminal prosecution he had been convicted of the forgery in question ; or that he had misappropriated money of Joslyn & Co., or others, we see no reason why these facts should not be considered in overcoming the presumption of innocence which attached to the witness. They were proper elements in determining what his character was, and enabled the jury to say just what there was to this presumption of innocence in his case.

We find no error ; therefore let the judgment be affirmed.